HAROLD J. AND MARY ELLEN C. RICHARDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Richards v. Commissioner
Docket No. 41654-84.
United States Tax Court
T.C. Memo 1987-280; 1987 Tax Ct. Memo LEXIS 280; 53 T.C.M. (CCH) 1016; T.C.M. (RIA) 87280; June 8, 1987. Harold J. Richards, pro se. John C. McDougal, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax in the amount of $12,524 for taxable year 1976 and $2,390.90 for taxable year 1980. The issues for decision are: (1) whether petitioners are entitled *281 to an ordinary stock loss under the provisions of section 1244[1] for stock that became worthless for taxable year 1979 [2] in the amount of $50,000 and (2) whether the loss generated by petitioners' investment in a restaurant should be treated as an ordinary loss or capital loss for taxable year 1980. Some of the facts have been stipulated. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. FINDINGS OF FACT Petitioners are husband and wife. They resided in Richmond, Virginia when the petition in this case was filed. Petitioners timely filed joint Federal income tax returns for 1976, 1979 and 1980 with the Internal Revenue Service Center in Memphis, Tennessee. On January 4, 1982, petitioners *282 filed an amended return for 1976 in which they claimed a deduction for a net operating loss carryback from 1979. On September 20, 1984, respondent mailed a statutory notice of deficiency to petitioners upon which the petition in this case is based. Petitioner Harold Richards (Richards), David Sparks (Sparks) and Robert Parrish (Parrish) formed PSR, Inc., a restaurant corporation, (PSR) in September, 1978. Richards, Sparks and Parrish each owned 33-1/3 percent of the stock of PSR. [3] Their initial contribution for the stock of PSR was in the form of a joint guarantee of a corporate note for $90,000, which amount was loaned to PSR by the Bank of Virginia. The three shareholders agreed with the bank to be jointly and severally liable as guarantors of the corporate note, although only Richards and Parrish actually signed the guarantee. The record contains no explanation why the bank did not require the signature of Sparks. The amount of the corporate liability to the bank was subsequently increased by two further advances of $10,000 each, plus accruals. Total liability on the Bank of Virginia note reached approximately $125,750. *283 Richards and Sparks, Inc., a separate corporate entity established by Richards and Sparks without Parrish, advanced $17,627.80 to Richards and Sparks individually who, in turn, invested the money in PSR. Richards and Sparks, Inc. charged this amount equally to the "advance accounts" of Richards and Sparks. PSR became insolvent in 1979. After becoming insolvent, Richards and Sparks each satisfied his liability on the guarantee of the Bank of Virginia note by executing a personal note in favor of the Bank of Virginia in the amount of $41,917, which amount represented one-third of the outstanding balance of the corporate liability. The bank had to sue Parrish for his share of the guarantee, and that suit was later settled by him for $21,000, based on his ability to pay. At some point subsequent to September 15, 1978, a document entitled "Consent in Writing Shareholders and Directors of PSR, Inc." (consent resolution) was created. The consent resolution, which purported to adopt several resolutions, recited that "All the Stockholders and Directors of PSR, Inc. hereby adopt the following resolutions * * *." The consent resolution, which had signature lines for Parrish, Richards *284 and Sparks was signed only by Richards and Sparks. The space for Parrish's signature was left blank. The number of shares of stock PSR would issue was also left blank. The consent resolution was executed by Richards and Sparks "as of" September 15, 1978. But at trial neither Richards nor Sparks could testify that it was in fact signed on that date and the record does not indicate when it was actually signed. Among the resolutions included in the consent resolution was one calling for the issuance of section 1244 stock. This resolution provided, among other things, that the maximum amount to be received by the corporation for section 1244 stock was $100,000. Richards, Sparks and Parrish neither received nor saw any stock certificates of PSR. Sparks did not recall when stock was to be issued and neither Richards nor Sparks had any personal knowledge that stock was in fact issued. Richards never saw the corporate minute books nor stock books and did not know whether any records had been kept. Sparks did not recall how many shares were issued or what he paid for the stock. Parrish was not aware of the existence of the section 1244 plan to issue stock. On or about February 29, 1980, Stephen *285 Swain, an attorney who handled the incorporation of PSR, dictated a letter to Sparks which stated as follows: Dear David: This is to advise that when the above captioned corporation (PSR) was set up, "1244" stock was issued. I am enclosing a copy of the records which indicate this. Despite reference to the same, no enclosures accompanied the letter. Typed on the bottom of the letter was the following: "Dictated by Mr. Swain and signed in his absence." During her examination of Richards' and Sparks' income tax returns, the revenue agent was never provided a copy of the section 1244 plan by the CPA representing Richards and Sparks. PSR never filed any income tax returns. No records of PSR were produced at trial of this case. On their income tax return for 1979, petitioners claimed an ordinary loss in the amount of $50,000 under section 1244 and a capital loss of $731. The total loss of $50,731 represented the total of petitioners' personal note to the Bank of Virginia, $41,917, plus one-half of the $17,626.80, $8,813.40, advanced from Richards and Sparks, Inc. On their amended return for 1976, petitioners claimed a net operating loss carryback deduction in the amount of *286 $23,998 based on the claimed section 1244 loss in 1979. On his 1980 return, Parrish claimed a long-term capital loss for the $21,000 he paid out in settlement of the suit brought against him by the Bank of Virginia. In 1978, Richards and Sparks formed HJR Corporation, Inc., (HJR) to own and operate a restaurant in Richmond, Virginia, to be known as the River Road Tavern. A "corporate charter" was issued to HJR, but no organizational meeting of stockholders was held. The lease for the property on which the River Road Tavern was to be built was in the name of HJR, and Richards was also personally liable on the lease. Richards and Sparks borrowed $27,608 on a personal note on which they were jointly liable and put the loan proceeds into a HJR corporate checking account. The entire amount in the account was subsequently expended on various development costs paid on HJR corporate checks signed by Richards. After the PSR project failed, Richards and Sparks decided to abandon the HJR project as well. On their income tax return for 1980, petitioners claimed one-half of the capital investment in HJR, or $13,804 as an ordinary loss on a joint venture. Respondent disallowed the ordinary *287 loss, allowing instead a deduction for a capital loss in the same amount. OPINION The first issue for decision is whether petitioners are entitled to an ordinary loss deduction for stock purportedly issued under section 1244. The burden of proving entitlement to the deduction under section 1244 is on the taxpayer. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In the case of a special tax benefit, such as is provided by section 1244, the taxpayer must meet his burden of proof with respect to each element required by the statute. See Childs v. Commissioner,408 F.2d 531, 533 (3d Cir. 1969). [4]
In order to qualify as section 1244 stock, the stock of PSR must meet the requirements set forth in section 1.1244(c)-1, Income Tax Regs.[5] That regulation sets forth numerous requirements that must be met in order to qualify stock as section 1244 stock. Set forth below are only those requirements which we find petitioners have failed to establish. *288 1. The stock must have been issued by the corporation under a written plan adopted by the corporation on or before November 6, 1978, to offer only this stock during a specified period ending not more than two years after the date the plan is adopted. The plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation as consideration for the stock. Section 1.1244(c)-1(f)(1)(i), Income Tax Regs.
2. The stock must be issued during the period of the offer. Section 1.1244(c)-1(f)(1)(ii), Income Tax Regs.
3. The stock may not, in fact, be issued *289 prior to adoption of the plan. Section 1.1244(c)-1(f)(1)(iii), Income Tax Regs.
4. If the total amount paid for the stock exceeds the amount authorized under the plan, none of the stock can qualify under section 1244. Section 1.1244(c)-1(f)(1)(iv), Income Tax Regs.
5. The plan to issue section 1244 stock must appear upon the records of the corporation, and the corporation should maintain records of the stock issued and the consideration received therefore. Section 1.1244(e)-1, Income Tax Regs.
Petitioners have failed to establish that a written plan was properly adopted by the corporation. The consent resolution declared that all shareholders adopted the resolutions, including one calling for a section 1244 stock plan, but Parrish did not sign the resolution and was not aware of any such stock plan. [6] Petitioners only response to the missing signature is that Parrish was not a shareholder of PSR and therefore was not required to sign the Consent Resolution. This position is not supported by the facts as set forth in our findings and leaves unanswered the questions why Parrish *290 would guarantee PSR's Bank of Virginia note and receive nothing in return while Richards and Sparks did the same in return for equal shares of PSR stock, and why Parrish's name would appear on the Consent Resolution were he not an owner of PSR stock. Petitioners also failed to establish that the stock was issued, if ever, within the offer time period, and generally failed to establish that they individually or PSR maintained adequate records regarding issuance of the stock as required by the regulations. Petitioners' only response to the glaring absence of any records relative to PSR's 1244 stock plan was that the records were generated and maintained by their attorney, Mr. Swain. Mr. Swain's letter of February 29, 1980, to *291 Sparks does little to resolve the question of whether 1244 stock was ever issued. The letter was not signed by Mr. Swain and did not contain the 1244 stock plan records allegedly enclosed. Respondent stipulated to the existence of the letter, but objected on the basis of the hearsay rule as to its being used to establish the existence of PSR's section 1244 stock records. Petitioners stated they were unsuccessful in previous attempts to contact Mr. Swain, but wanted to present his testimony before this Court. The Court held the record open to give petitioners an additional opportunity to call Mr. Swain, who resided in Norfolk, Virginia. The Court offered to hear Mr. Swain's testimony at any time prior to December 20, 1985, in Washington, D.C., Richmond, Virginia, or Norfolk, Virginia, at the parties convenience. The Court ordered petitioners to make the necessary arrangements to subpoena the records and contact respondent's counsel and the Court to reschedule the trial by December 20, 1985, if petitioners decided to call Mr. Swain as a witness. The Court heard nothing further from petitioners on this, or any other matter. Upon respondent's motion, the record in this case was *292 closed on February 12, 1986. Petitioners also failed to establish that the amount paid for the stock did not exceed that authorized under the plan. Indeed, their testimony establishes that at least $101,461.80 was paid for the stock, whereas the plan allegedly authorized total consideration of $100,000. [7]
This Court has previously recognized the importance of strictly enforcing the requirements of contemporaneous records set forth in the regulations in order to accomplish the Congressional purpose behind section 1244. [8] Due to a total lack of evidence concerning the creation, implementation and maintenance of a section 1244 stock plan, stock certificates and records, we must deny petitioners' deduction for a loss under section 1244. *293 The second issue for decision is whether petitioners are entitled to treat the loss generated from their investment in the River Road Tavern as an ordinary loss, as reported on their 1980 Federal income tax return, or as a capital loss, the adjustment set forth in respondent's statutory notice of deficiency. [9] If, as argued by respondent, petitioners contributed capital to HJR which in turn incurred the investment expenses associated with the River Road Tavern, the loss resulting from the failure of the tavern is capital in nature. However, if petitioners incurred expenses associated with the River Road Tavern personally, not through HJR Corporation, losses relating thereto are ordinary in nature. [10]
We find the facts clearly establish that petitioners intended to, and in fact did, incorporate, capitalize and accomplish their investment in the River Road Tavern for and in behalf of HJR. The parties stipulate that a "corporate charter *294 was issued to HJR by the Virginia State Corporation Commission." The record does not contain a copy of this document and no further mention of its content is made. However, we assume the parties were referring to a certificate of incorporation as provided in section 13.1-621 of the Virginia Stock Corporation Act (Code of Virginia, 1950, as amended). That section reads as follows: § 13.1-621. Issuance of certificate of incorporation. -- If the Commission finds that the articles of incorporation comply with the requirements of law and that all required fees have been paid, it shall issue a certificate of incorporation. When the certificate of incorporation is effective, the corporate existence shall begin. Upon becoming effective, the certificate of incorporation shall be conclusive evidence that all conditions precedent required to be performed by the incorporators have been complied with and that the corporation has been incorporated under this chapter. [Emphasis added]. Petitioners contend that because the organizational meeting of HJR directors and shareholders was not held, *295 the corporation was not in existence at the time it incurred the expenses associated with the River Road Tavern. However, Virginia law provides that the issuance of a certificate of incorporation is "conclusive evidence" that an entity has been properly incorporated under the laws of that state. Petitioners introduced no evidence of a dissolution of HJR or any act which would undermine its authority to validly conduct business in the State of Virginia. Absent evidence to the contrary, we conclude that HJR was properly incorporated and existed as a valid corporate entity under Virginia law as of the date petitioners incurred expenses associated with the River Road Tavern. HJR, not petitioners individually, invested in the River Road Tavern. Richards and Sparks borrowed $27,608 and put the loan proceeds into an HJR corporate checking account. All expenses relative to the River Road Tavern were paid out of the corporate checking account on HJR corporate checks. HJR, not petitioners or Sparks individually, was lessee of the real property on which the River Road Tavern was to be built. Petitioners' personal guarantee of both the real property lease and the note, whereby petitioners *296 obtained funds to contribute to HJR, does not transform the investment made by HJR to a personal one made by petitioners. Having concluded that HJR incurred the expenses relative to the River Road Tavern, and not petitioners in their individual capacity, we find petitioners are not entitled to treat the loss generated thereby as an ordinary loss. The loss will be treated as a capital loss, as determined by respondent. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners claimed a section 1244↩ stock loss of $50,000 on their 1979 Federal income tax return and a resulting net operating loss carryback to 1976. The deficiency for 1976 results from disallowance of this loss carryback from 1979.
3. At trial, Richards first stated Parrish was not a shareholder then later testified he was. In their brief, petitioners once again argue Parrish was a shareholder. Petitioners offer no explanation for Richards' testimony, which is inconsistent at best on this critical point. Parrish testified he owned 33-1/3 percent of the stock of PSR, and we so find.↩
4. See also Malawer v. Commissioner,T.C. Memo. 1975-351↩.
5. Stock issued before November 1978, referred to in the regulations as "pre-November 1978, stock" has slightly different qualification requirements than that of stock issued after that date. The record does not establish when the stock, if any, was issued, but petitioners' 1979 Federal income tax return reports a loss with respect to PSR stock acquired in September, 1978. Therefore, we assume the PSR stock constitutes pre-November 1978 stock within the meaning of section 1.1244(c)-1, Income Tax Regs.↩
6. The regulations do not require that a section 1244↩ stock plan be adopted by a vote of all shareholders. However, the plan in this case is flawed because the document purportedly authorizing the plan called for the signature of all shareholders but did not contain the signature of Parrish, a 33-1/3 percent shareholder. The fact that Parrish was not aware of a 1244 stock plan refutes any inference that his omitted signature was merely an administrative oversight.
7. Richards testified that he and Sparks each contributed $41,917.00 in the form of a guarantee of the corporate loan, plus $17,627.80 additional funds they acquired from Richards and Sparks corporation; a total consideration of $101,461.80. When Parrish's share of the corporate guarantee, $41,917.00, is added to the above, total consideration is $143,378.80.↩
8. Malawer v. Commissioner,T.C. Memo. 1975-351. In only one recorded case have we waived the requirement that the records be produced at trial. In Pensinger v. Commissioner,T.C. Memo. 1980-104, we permitted the taxpayer to offer secondary evidence that the provisions of section 1244 had been complied with where the testimony of the taxpayer's attorney and his CPA had established that the proper records had been kept but had been destroyed by a receiver in bankruptcy acting under court order. That case is factually dissimilar to the instant case. In addition, it should be noted that petitioners were given the opportunity to call their attorney after trial to testify in their behalf, although the record is normally closed at the conclusion of trial. Petitioners did not subsequently offer the testimony of their attorney, which gives rise to an inference that his testimony would not have been favorable to petitioners. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947).
9. Respondent challenges only the characterization of the loss not the amount thereof. ↩
10. Investment through HJR is the only impediment argued by respondent barring petitioners' ordinary loss treatment of the River Road Tavern expenses.↩